```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


CUSTOMMADE VENTURES           )
CORPORATION,                  )
                              )
              Plaintiff,      )    CIVIL ACTION NO.
                              )    11-10365-DPW
v.                            )
                              )
SENTINEL INSURANCE COMPANY,   )
LIMITED,                      )
                              )
              Defendant.      )
                              )
```

MEMORANDUM AND ORDER
September 17, 2012

CustomMade Ventures Corporation ("CustomMade") filed this suit alleging that Sentinel Insurance Company, Limited ("Sentinel") breached the insurance contract it sold to CustomMade and acted in bad faith in denying coverage. The parties filed cross-motions for summary judgment.

**I.   BACKGROUND**

A.   Facts

*1.   The Sentinel Policy*

In 2010, Sentinel issued a Hartford Spectrum Business Insurance Policy to CustomMade. The policy provided coverage for business and employment practice liability, as well as both a standard and a special property coverage form. The Special Property Coverage Form provided that Sentinel "will pay for direct physical loss of or physical damage to Covered Property at

the premises described in the Declarations . . . caused by or resulting from a Covered Cause of Loss."

That form contained coverage for forgery, but an endorsement titled "Forgery Coverage" modified it.  The Forgery Coverage endorsement contained, in relevant part, the following three sections, which form the basis for this dispute:

1. **Covered Property**

   Covered Property means the following instruments:

   **a.** *Checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain* in "money" that are:

   **(1)** Made or drawn by or drawn upon you;
   **(2)** Made or drawn by one acting as your agent;

   or that are purported to have been so made or drawn

   . . .

2. **Covered Causes of Loss**

   Covered Causes of Loss means forgery or alteration.

3. **Legal Expense Additional Coverage**

   If you are sued for refusing to pay any Covered Instrument on the basis that it has been forged or altered, *and you have our written consent to defend against the suit*, we will pay for any reasonable legal expenses that you incur and pay in that defense. . . .

   *2.   Former Employee Sues CustomMade*

On August 16, 2010, Kenneth Engelman brought suit in the Suffolk County Superior Court against CustomMade claiming, among

2

other things, breach of contract.  Engelman claimed that CustomMade and its CFO induced him to leave a lucrative job to come and work for them as a partner and co-owner of the company, but then did not follow through with their promises.  Engelman came to CustomMade, in part, based on an e-mail he provided to the court from CustomMade's president, Michael Salguero, dated August 18, 2009 at 12:56:45 p.m.  That e-mail stated:

> Seth [CustomMade's CFO] and I have put our heads together regarding how to bring you on while guaranteeing your $5000 a month.  We think we have figured it out.  Here is what we propose:
>
> - We bring you on for a 6 month Independent Contractor agreement; then on March 15, 2010 you become full time Partner/Director of Business Development (you are this from day 1 – just a legal formality)
> - For your services, we pay you $5,000 per month + 10% commission on all subscriber/advertising revenue, then after March 16, 2010 the original compensation plan begins.
>
> . . .
>
> We see this as a really good compromise to get the cash that you need without needing to pay a massive salary to get you $5,000 net.  We need you Ken which is why we are offering you so much including stock and part ownership in Custom Made[sic].

On August 17, 2010, CustomMade retained Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C. to defend against the Engelman suit.  On August 24, 2010, CustomMade sent the Engelman Complaint to Sentinel with a letter "as written notice of a claim . . . under the above referenced Hartford Spectrum Business Insurance Policy."

On September 17, 2010, Sentinel sent a letter to CustomMade informing it that it was investigating the claim that the Engelman suit fell within the insurance policy. That letter cited the Business Liability Coverage Form and the Employment Practice Liability Coverage Form, not the forgery endorsement to the Special Property Coverage Form, as the relevant underlying coverage framework. The letter stated, in relevant part, the following:

> At this time the Sentinel Insurance Company, Limited (hereafter "The Hartford") *is not in a position to either accept or reject this claim*. *While we are investigating this claim*, we wish to advise you that The Hartford reserves all rights under the policy. The Hartford specifically reserves the right to deny coverage or raise any policy grounds, conditions, or exclusions to coverage that may be applicable, pending completion of their coverage investigation.
>
> Custom Made [sic] Ventures Corporation, Michael Salguero and Seth Rosen *will need to protect their interests in this case* while The Hartford conducts its investigation. *Should it be determined* that The Hartford owes any party seeking coverage a defense, we will reimburse reasonable attorneys' fees and costs from the date of the tender.

(emphasis added).

### 3. *Investigation of E-Mail as Fraudulent*

Seth Rosen, CustomMade's CFO, searched his account for the Salguero e-mail produced by Engelman in his complaint. When he found it, he noticed that his version of the e-mail was different from the one produced by Engelman. Instead of promising $5000 per month, the e-mail Seth Rosen found offered $4500, and it said

4

nothing about Engelman becoming a CustomMade Partner on March 16, 2010.

On August 31, 2010, CustomMade hired a computer forensic expert, Elysium Digital, LLC, to determine whether the Engelman-produced e-mail was authentic.

Elysium submitted a written report on September 27, 2010, detailing that, because the original Engelman-produced e-mail was missing, Elysium could not "definitively authenticate it or any of its contents as being genuine." Elysium was able to authenticate CustomMade's copy of the e-mail, however. Elysium concluded that "forensically speaking and until proven otherwise, the Engelman email message does not appear to exist."

CustomMade did not provide Sentinel with a copy of the Elysium report, though CustomMade relied on the report in its September 27, 2010 motion to dismiss Engelman's complaint in Suffolk County Superior Court.

*4.    Sentinel Denies Coverage*

On November 22, 2010, Sentinel issued a letter denying coverage under the "relevant underlying coverage forms" which were said to be "the Business Liability Coverage Form and the Employment Practices Liability Coverage Form," and the "Umbrella Liability Provisions."

*5. The Underlying Litigation is Terminated*

The Suffolk County Superior Court dismissed Engelman's complaint with prejudice on January 25, 2011.

B.    Proceedings

On March 3, 2011, CustomMade filed this suit against Sentinel claiming breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of Massachusetts General Laws chapter 93A for denying coverage under the insurance contract. CustomMade's complaint seeks damages of $78,224.83---its attorney's fees from defending against the Engelman claim---as well as its attorney's fees here in the instant litigation.

In order to focus the issues promptly, at the initial scheduling conference I directed the parties to file an Agreed Upon Statement of facts and cross-motions for summary judgment within 90 days. They did so, but Sentinel included with its motion for summary judgment an affidavit from the claim manager responsible for CustomMade's claim explaining that he did not intend for his letter to be the "written consent" required for coverage under the policy, nor did he look to see whether CustomMade's claim fell under the forgery endorsement to the Special Property Coverage Form. CustomMade has moved to strike that affidavit, but I find that motion moot because I do not rely

upon the claim manager's affidavit in resolving the cross-motions for summary judgment.

## II.  STANDARD OF REVIEW

A movant is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch.* v. *RNK, Inc.*, 632 F.3d 777, 782 (1st Cir. 2011) (citation omitted).  However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment.  *Sullivan* v. *City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).

I "view the facts in the light most favorable to the party opposing summary judgment."  *Rivera–Colón* v. *Mills,* 635 F.3d 9, 10 (1st Cir. 2011).  Because I am addressing cross-motions for summary judgment, I "must view each motion, separately, through this prism."  *Estate of Hevia* v. *Portrio Corp.,* 602 F.3d 34, 40 (1st Cir. 2010).

### III. MOTIONS FOR SUMMARY JUDGMENT

Without discovery, CustomMade and Sentinel both moved for summary judgment. CustomMade moved for summary judgment on its breach of contract claim, while Sentinel moved for summary judgment on all of CustomMade's claims. For the following reasons, I grant Sentinel's motion, and deny CustomMade's motion.

To prove a breach of contract, a plaintiff must show that there was a valid and enforceable contract creating a duty owed by the defendant that he breached by an action or omission, which proximately and directly caused harm to the plaintiff. *Bosque* v. *Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342, 351 (D. Mass. 2011). The only questions at issue are (1) whether Sentinel owed CustomMade a duty, and (2) if so, whether it breached any such duty.[1]

For Sentinel to have owed CustomMade a duty under the insurance contract, the claim presented by CustomMade must fall within the terms of one of the coverage forms. CustomMade only claims that the forgery endorsement to the Special Property Coverage Form applies here. By the plain terms of the Special Property Coverage Form as modified by the forgery endorsement, CustomMade must show three things: (1) the loss involved "Covered Property," (2) CustomMade incurred the loss because it refused

---

[1] Because I find below that Sentinel did not owe CustomMade a duty, I do not reach the second question.

"to pay [a] Covered Instrument on the basis that it [was] forged or altered," and (3) CustomMade obtained Sentinel's "written consent to defend against the suit."  See *Essex Ins. Co.* v. *BloomSouth Flooring Corp.*, 562 F.3d 399, 404 (1st Cir. 2009) ("The insured initially bears the burden of showing that the allegations in the underlying complaint fit within the covered risks in the policy.").  CustomMade cannot show that the loss involved "Covered Property" or that it had obtained Sentinel's "written consent to defend against the suit," and therefore its breach of contract claim must fail.

A.   Covered Property

"Covered Property" is defined in the contract as "[c]hecks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in 'money' that are: (1) Made or drawn by or drawn upon you; (2) Made or drawn by one acting as your agent; or that are purported to have been so made or drawn." The only way CustomMade argues that the forged e-mail fits within the "Covered Property" definition is by taking a portion of that definition out of context and claiming that the e-mail was a "written promise . . . to pay a sum certain."

Courts must construe contracts in context and give meaning to every word. *Comp. Sys. Am. Inc.* v. *W. Reserve Life Assurance Co.*, 475 N.E.2d 745, 751 (Mass. App. Ct. 1985); see 17A Am. Jur. 2d *Contracts* § 377 ("It is a fundamental rule of contract

construction that the entire contract, and each and all of its parts and provisions . . . must be given meaning, and force and effect, if that can consistently and reasonably be done."). Courts do this using the canons of *ejusdem generis* ("things of the same kind") and *noscitur a sociis* ("it is known from its associates"). These principles mean that a court should determine the meaning of a general term in the context of the other terms in the list. *See, e.g.*, *Wash. Dep't Soc. & Health Servs.* v. *Guardianship Estate of Keffeler*, 537 U.S. 371, 384-85 (2003). "Though lawyers do not learn as much Latin as they used to, there is nothing esoteric about listing a series of examples and considering whether something else is like things in the list." *United States* v. *Holmes*, 646 F.3d 659, 665 (9th Cir. 2011) (citation omitted).[2]

---

[2]  Indeed, as Judge Kleinfeld notes in *Holmes*, lawyers are not the only ones who use these principles.

> People use the principles of *ejusdem generis* and *noscitur a sociis* all the time, to understand ordinary speech, without realizing that they are doing so, just as they do not realize that they are speaking prose. When the waiter says "would you like a cocktail? wine? anything else?," we know he is asking for a drink order, not a dessert order, and not whether you would like a new car, even though a new car would fall within the "anything else" category were the phrase considered according to dictionary meaning without regard to context. And when the grade school boy tells his mother "we have to bring a ruler, a pencil, paper, and other stuff to school tomorrow," we know he is talking about school supplies, not his pet puppy.

*United States* v. *Holmes*, 646 F.3d 659, 665 (9th Cir. 2011).

The insurance contract lists four forms of "Covered Property": "Checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in 'money.'" *Id.* The general term "similar written promises, orders or directions to pay a sum certain" follows a list of three specific terms, "[c]hecks, drafts, [and] promissory notes." Thus, applying the principles of *ejusdem generis* and *noscitur a sociis*, the "similar written promises" must be of the same kind or class of things as "[c]hecks, drafts, and promissory notes." *See* 17A Am. Jur. 2d *Contracts* § 364 ("Where general words follow the enumerations of particular kinds or classes of persons or things, the general words will, unless a contrary intent is manifested, be construed as applicable only to persons or things of the same general nature or class as those specifically enumerated."). The contract itself makes this explicit by limiting the general term to those "written promises, orders or directions" which are "similar" to "[c]hecks, drafts, and promissory notes."

A check is a "draft signed by the maker or drawer, drawn on a bank, payable on demand, and unlimited in negotiability." *Black's Law Dictionary* 269 (9th ed. 2009). A draft is an "unconditional written order signed by one person (the *drawer*) directing another person (the *drawee* or *payor*) to pay a certain sum of money on demand or at a definite time to a third person (the *payee*) or to bearer." *Id.* at 566 (emphasis in original).

11

And a promissory note is an "unconditional written promise, signed by the maker, to pay absolutely and in any event a certain sum of money either to, or to the order of, the bearer or a designated person." *Id.* at 1162.  All are forms of negotiable instruments.  *Id.* at 1136 (defining a negotiable instrument as a "written instrument that (1) is signed by the maker or drawer, (2) includes an unconditional promise or order to pay a specified sum or money, (3) is payable on demand or at a definite time, and (4) is payable to order or to bearer").

The e-mail here is not similar to a check, draft, or promissory note and it is not a negotiable instrument.  The e-mail contained a proposal to establish an employment relationship, not a signed unconditional written order directing someone to pay Engelman a certain sum of money.  Engelman could not take the e-mail to a bank and demand payment, just as he could not use an IOU from CustomMade written on a scrap of paper to pay his credit card bill.  Thus, it is not of the same kind or class as a "check, draft, or promissory note."[3]

CustomMade argues that where there is an ambiguity in an insurance contract, the policy must be construed in favor of the insured.  *See Preferred Mut. Ins. Co.* v. *Gamache*, 675 N.E.2d 438, 441 (Mass. App. Ct. 1997).  However,

---

[3] In fact, it is not even a "promise[], order[] or direction[] to pay a sum certain," because it was conditional upon Engelman's acceptance of the job.

> [a] term [in an insurance policy] is ambiguous only if
> it is susceptible of more than one meaning and
> reasonably intelligent persons would differ as to which
> meaning is the proper one. . . . An ambiguity is not
> created simply because a controversy exists between the
> parties. . . .

*Sullivan* v. *Southland Life Ins. Co.*, 854 N.E.2d 138, 141-42 (Mass. App. Ct. 2006) (citations, quotations, and punctuation marks omitted).  "Difficulty in comprehension does not equate with ambiguity."  *Mass. Prop. Ins. Underwriting Ass'n* v. *Wynn*, 806 N.E.2d 447, 450 (Mass. App. Ct. 2004).

Here, no objectively reasonable insured would expect that a property-insurance provision which protects the insured from loss for refusing to pay a forged check would provide liability-insurance for a forged e-mail giving rise to an employment dispute.  Thus, the rule that ambiguities in an insurance contract must be strictly construed in favor of the insured provides no traction for CustomMade.

Reading the contract terms in context, the Engelman e-mail is not "Covered Property," and therefore summary judgment is appropriate for Sentinel.

B.   <u>Written Consent</u>

Even if the e-mail was a form of "Covered Property," Sentinel argues that it did not give CustomMade its written consent to defend the suit, as required by the contract. CustomMade argues that the September 17, 2010 letter from

13

Morgillo manifests Sentinel's written consent.  That letter said, in relevant part:

> At this time the Sentinel Insurance Company, Limited (hereafter "The Hartford") *is not in a position to either accept or reject this claim*.  *While we are investigating this claim*, we wish to advise you that The Hartford reserves all rights under the policy.  The Hartford specifically reserves the right to deny coverage or raise any policy grounds, conditions, or exclusions to coverage that may be applicable, pending completion of their coverage investigation.
>
> Custom Made [sic] Ventures Corporation, Michael Salguero and Seth Rosen *will need to protect their interests in this case* while The Hartford conducts its investigation.  *Should it be determined* that The Hartford owes any party seeking coverage a defense, we will reimburse reasonable attorneys' fees and costs from the date of the tender.

(emphasis added).

CustomMade claims that the first sentence of the second paragraph was Sentinel's written consent required under the forgery endorsement to the Special Property Coverage Form for CustomMade to defend against Engelman's claim.  CustomMade, again, takes the quote in isolation, depriving it of the meaning derived from reading it in context.

When taken in context, it is clear that the phrase CustomMade highlights was not granting Sentinel's written consent.  The letter states that Sentinel was still investigating CustomMade's claim and was "not in a position to either accept or reject" it at the time of the writing.  The letter qualified any form of reimbursement upon a determination that Sentinel "owe[d]

any party seeking coverage a defense," and noted that determination had not been made yet. Finally, the letter only cited the Business Liability Coverage Form and the Employment Practices Liability Coverage Form as possible sources of coverage for CustomMade's claim, not the Special Property Coverage Form as modified by the forgery endorsement.

It is therefore difficult to see how the advice that CustomMade and its CEO and CFO "will need to protect their interests in this case while [Sentinel] conducts its investigation" is a written consent to defend them against an action arising from the forgery endorsement. The letter made it explicit that Sentinel was investigating whether CustomMade's claim was covered; it stated that Sentinel was only considering the underlying Business and Employment Practice Liability coverage forms, not the forgery endorsement; and it said that Sentinel had not yet determined whether to accept or reject CustomMade's claim. If coverage under the relevant provisions of the contract had not yet been determined, and Sentinel was not even considering the forgery endorsement as a potential source of coverage for the claim, Sentinel's letter could not have given CustomMade written consent under the forgery endorsement to defend the lawsuit.[4]

---

[4] CustomMade's 93A and Bad Faith claims are predicated upon the Engelman claim falling within the scope of the Sentinel insurance contract. Because the Engelman claim is not within the scope of the contract, Sentinel did not act in bad faith or engage in

## IV.   CONCLUSION

For the reason set forth above, I (1) treat CustomMade's motion to strike (Dkt. No. 23) as moot; (2) GRANT Sentinel's motion for summary judgment (Dkt. No. 17); and (3) DENY CustomMade's cross motion for summary judgment (Dkt. No. 18). The Clerk shall enter judgment for the defendant Sentinel in accordance with this Memorandum and Order.

                              /s/ Douglas P. Woodlock
                              DOUGLAS P. WOODLOCK
                              UNITED STATES DISTRICT JUDGE

---

unfair or deceptive business practices in denying coverage. CustomMade cites no caselaw holding that an insurance company acts in bad faith if it does not consider an inapplicable portion of an insurance policy in determining whether to accept or reject a claim.  Thus, its 93A claim also fails.  *See Gulezian* v. *Lincoln Ins. Co.*, 506 N.E.2d 123, 127 (Mass. 1987) ("An insurance company which in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy is unlikely to have committed a violation of G.L. c. 93A."). Although a 93A claim is usually a question of fact, *Commercial Union Ins. Co.* v. *Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir. 2000), where, as here, no reasonable jury could decide for the non-movant, summary judgment is appropriate.